PEARL EADS, Appellant, v. YOUNG WOMEN'S CHRISTIAN ASSOCIATION ET AL.—29 S. W. (2d) 701.

Division Two, June 11, 1930.

578

*Gamble, Trusty & Pugh* for appellant.

*McCune, Caldwell & Downing, Conrad & Durham, Harry & Koontz* and *H. M. Beardsley* for respondents.

580

COOLEY, C.—Action for damages for personal injuries brought by plaintiff in the Circuit Court of Jackson County. At the close of plaintiff's evidence the court sustained defendants' demurrer thereto and gave instructions directing a verdict for defendants, whereupon plaintiff took an involuntary nonsuit with leave and in due time moved to set same aside. Such motion being overruled, plaintiff appealed.

Defendant Young Women's Christian Association of Kansas City, Missouri, which we shall refer to as the Y. W. C. A., was incorporated about 1890 under the provisions of Article X, Chapter 42, Revised Statutes 1889, now Article XI, Chapter 90, Revised Statutes 1919. Two of the individual defendants, Mrs. George H. Gorton and Mrs. Herbert V. Jones, are alleged in plaintiff's petition to be, respectively, president and first vice-president, and the nine other individual defendants (men) to constitute the board of trustees of defendant Y. W. C. A.

Defendant Y. W. C. A. owns a six-story building situated at No. 1020 McGee Street in the business district of Kansas City, Missouri. Plaintiff, a young woman twenty-two years of age at the time of her injury, April, 1923, was an employee of the Y. W. C. A., engaged in operating a passenger elevator in said building. At the time in question the first or ground floor of the building, aside from the space called the lobby, was occupied by the Y. W. C. A. for its offices and the third floor for its reading rooms, rest rooms, etc. The sixth floor was undergoing repairs and was not occupied. There was a cafeteria in the basement. It is not definitely shown, but may be inferred, that the cafeteria was operated by the

Y. W. C. A. in connection with its benevolent activities. The remaining floor space, that on the second, fourth and fifth floors, was rented to tenants who carried on divers business pursuits unrelated to those of the Y. W. C. A. The elevator, being the only one in the building, was used in common by the Y. W. and its said tenants and their respective employees, customers and patrons. Plaintiff was injured as she started the elevator downward from the third floor, to which she had just taken a passenger who worked for one of the fourth-floor tenants. The injury was caused by the catching of her dress on the prongs of an unguarded device called a safety lock, attached to the inside of the elevator shaft at the floor level, which device was designed to hold shut the door opening into the elevator shaft when the elevator itself was not at that floor. Plaintiff was thrown against the lever which controlled the movement of the elevator, thereby reversing the course of the latter, and as it moved upward plaintiff's foot and the lower part of her leg were caught between the elevator floor and the wall of the shaft and injured. There was evidence tending to show that the safety lock could have been so placed or so guarded as to have prevented the injury.

Plaintiff in her petition alleged that she was in the employ of the corporation defendant and that the individual defendants were managing officers of said association, "and as such had charge of said building, and that said officers and their associates, appointees and agents were charged with the duty of supervision, management and operation of said building and said elevator therein;" and that her injuries were caused by defendants' negligence in that they: (1) failed to have the above mentioned device guarded so as to prevent such occurrences; (2) failed to provide the exit of the car with a door or collapsible grill or other shield to protect plaintiff; (3) failed to warn plaintiff of the presence of said device and of the danger therefrom; (4) failed to provide sufficient light to enable plaintiff to see and avoid the danger; (5) failed to have said device so located as that plaintiff would not have been exposed to danger therefrom; and (6) failed to provide her a reasonably safe place in which to work.

Defendant Y. W. C. A. answered, admitting its incorporation under the statute above referred to, alleging that it was and is a benevolent and charitable association, without capital stock, not operated for profit, and that all of its revenue from all sources, including donations from the public as well as income from its property, constitutes a common fund and is used solely for the chartered charitable purposes of the association, wherefore it claims exemption from liability. It also pleaded assumption of risk and contributory negligence by plaintiff. The individual defendants answered by general denials.

582

Such further reference to the facts as may be necessary will be made in connection with points discussed to which they may be applicable.

I. The question most stressed as to the Y. W. C. A., and which has been elaborately briefed on this appeal, is whether or not, if said defendant is a charitable institution, it is liable in damages for injury to its employee due to its negligence. Preliminary to this question it is necessary to determine whether it sufficiently appears from the record that it is such charitable institution.

The articles of incorporation of defendant association and its constitution and by-laws authorized by and adopted pursuant thereto, were offered in evidence. By the articles of incorporation its declared object is the promotion of the spiritual, intellectual, social and physical welfare of young women. Its policy "shall be definite work for young women only, in all departments." Five classes of membership are provided for, viz., active membership, open to all women over sixteen years of age who are members of Protestant evangelical churches; associate membership, open to all women of good moral character upon payment of not less than $5 per annum; life membership, which may be conferred upon payment of $50; and honorary membership, which may be conferred upon payment of $100 or may be given as a compliment without payment of money to residents of other cities and people of prominence. Only active members can vote or hold office on the board of managers; otherwise active and associate members enjoy the same privileges. Provision is made for a board of trustees to be composed of twelve men, three-fourths of whom must be members of Protestant evangelical churches in Kansas City. Authority is given for the adoption of a constitution and by-laws consistent with the charter and the laws of the State. Provision is made for the selection of managers, trustees and necessary officers, which need not be noted in this connection.

In the constitution adopted pursuant to the articles of incorporation, the purpose of the association is declared to be "to associate young women in personal loyalty to Jesus Christ as Saviour and Lord; to promote growth in Christian character and service through physical, spiritual, mental and social training; and to become a social force for the extension of the Kingdom of God."

In the by-laws it is provided that any girl or woman over eighteen years of age, of good character, may become a member of the association by paying dues of one dollar per year, and any girl between the ages of ten and eighteen years by paying fifty cents per year. The by-laws are too long to summarize, but it may be stated that they are designed and calculated to provide in detail

for carrying out the purposes of the association as expressed in its charter and constitution. As illustrative of the character and scope of the association's work, mention may be made of some of the activities provided for. There is an employment department to assist girls and women to secure suitable employment under proper conditions; a cafeteria department to make provision for lunch room and a club dining hall; a boarding house department to have charge of the "Boarding Home" and provide suitable entertainment and recreation for the girls in the home; an educational department to promote the educational work of the association, provide for classes, educational clubs, practical talks and lectures and library and reading rooms. "It shall aim, in co-operation with other institutions, to raise the educational standards of the community." There is a department of physical education and hygiene to devise means for promoting health "through such agencies as the gymnasium, swimming pool, summer camp, Camp Fire Girls and the Health and Honor League;" and a department of religious work which, "in co-operation with the churches, shall seek to ascertain the religious need of the young women of the community, and aim to meet these needs through Bible study, religious meetings, missionary interest and Christian service." Another department is charged with the duty of seeking to bring all the advantages of the association within the reach of girls and women industrially employed and of girls and women in near-by communities.

Other provisions of the by-laws along the same or similar lines might be mentioned, but the foregoing are sufficiently illustrative. The association has no capital stock and nowhere in the articles of incorporation, constitution or by-laws is there any provision authorizing pecuniary profit to its members.

We do not understand appellant to question the charitable character and activities of the Y. W., but her position seems to be that in renting the portion of its building not used directly in carrying on its benevolent work it is engaged in a commercial enterprise. Plaintiff alleges in her petition that said association "owns and is and long has been engaged in the renting and operation of a large, modern, six-story and basement office building . . . which it rents out annually to business and professional persons . . . wholly disconnected with defendant's benevolent and social welfare activities and eleemosynary purposes," deriving revenue therefrom, using only a part of said building for its said benevolent and social welfare activities. She does not allege what the association does with the income so derived, leaving the inference that she means to charge that such income is a profit to the corporation.

It may be noted in this connection that defendant's answer did not admit receiving rents from the property in question, and plaintiff's proof failed affirmatively to show that it did, plaintiff contenting herself with a showing that portions of the building were "occupied" by various business concerns. Plaintiff in her brief here contends that defendants admitted in the opening statement to the jury, made by their counsel, that such was the case and quotes portions of the statement to that effect. But the statement, which is set out in the record, shows that while defendants' counsel did so state, he also said in the same connection and as part of his statement on that subject, in substance, that the association acquired the building with funds donated by the public for that purpose, and that it rented such portions of the building from time to time as it did not require for its own use and used the rentals so received in carrying on its charitable work, together with all other income from all sources, and that there was always a deficit which was made up by charitable contributions; that the association's officers and trustees served without pay and that the members of the association got no profit but, on the contrary, contributed to it. If we are to consider part of what counsel said in his statement on that subject it would seem but fair that the statement should be taken as he made it, not merely detached portions thereof.

We think, however, that regardless of the statement referred to it clearly appears from its articles of association, constitution and by-laws, that defendant Y. W. is a charitable organization. See Nicholas v. Evangelical Deaconess Home, 281 Mo. 182, 219 S. W. 643, where that conclusion was based upon the articles of association. Assuming that business firms and persons who occupied portions of its building paid rent therefor, we must also assume, there being no proof to the contrary, that the association used the income so derived in accordance with its declared and authorized purpose and the law under which it was incorporated. Under that law the association was authorized to hold such real estate and buildings as might be necessary for its purpose, and to receive income from such other rooms as might be requisite to the completeness of such buildings; "but such income shall be applied to the purpose of such corporation as defined in Section 2825." [Sec. 2833, R. S. 1889; Sec. 10275, R. S. 1919.] Besides, the scope of the association's benevolent activities as indicated by the portions of the by-laws above referred to shows that they could not possibly be carried on with funds derived from the nominal dues paid by members of the association. On the record presented it is apparent that the Y. W. is a charitable association. The fact that it derived some revenue from rental of parts of its building does not destroy its status as a charity. In Nicholas v. Evangelical Deaconess Home, supra, the defendant received by far the largest part of its income

from patients who paid for what they received, but this court said that such fact "in no wise destroyed defendant's character as a charity, because, such funds, as well as those received from dues and donations, were held in trust by it for the charitable and benevolent purposes of its organization;" citing numerous authorities showing such to be the general rule.

II. This brings us to the consideration of the question whether or not defendant association should be required to respond in damages for plaintiff's injuries, assuming that such injuries were occasioned by negligence of defendants, as alleged. There was no evidence to support the specification of lack of sufficient light, but for the purpose of this discussion we will assume there was sufficient evidence to present a jury question as to other specifications of negligence charged against defendant association, if it may be held liable. The question is one which has received much judicial consideration and the conclusions reached, as well as the reasons assigned therefor by the courts in various jurisdictions show great diversity of judicial opinion. In some jurisdictions charitable organizations are held exempt from liability for negligence of their officers and servants. In most jurisdictions institutions such as charitable hospital associations are exempted from liability for negligent injury to a recipient of their service, and this regardless of whether the ministrations received are paid for by the recipient or not. A number of courts hold such organizations liable for negligent injury to their employees or to strangers, while others hold that even in such case a charitable organization is exempt from liability. Some courts distinguish between injury caused by negligence of a servant in whose selection proper care had been exercised and injury due to incompetence of a servant not selected with due care or to negligence of the managing officers themselves; holding the association exempt from liability in the former circumstance and not in the latter.

Different reasons have been assigned for exemption from liability, as: that the property and income of charitable institutions constitute a trust fund for the charitable purposes of the organization which may not be depleted or diverted from such purpose, either directly by act of the trustees or managing officers or indirectly by payment of damages for their negligence; that it is better public policy to hold them exempt; that the doctrine of *respondeat superior* does not apply; that one accepting the service or benefit of such institution thereby impliedly consents to waive any claim for compensation for injuries he may receive through its negligence. Other grounds have been suggested. And it may be added that all of the different doctrines upon which non-liability of charitable associations has been placed by different courts have been criticised and excepted to by other courts.

As illustrative of the rule adopted by most courts that institutions such as charitable hospitals (most of the reported cases announcing the rule being suits against hospitals) are exempt from liability to a recipient of the institution's benefits, whether the service received was paid for or not, reference may be made to Nicholas v. Evangelical Deaconess Hospital, supra, and authorities cited therein; Roosen v. Peter Bent Brigham Hospital, 235 Mass. 66, 14 A. L. R. 563; Mikota v. Sisters of Mercy, 183 Iowa, 1378, 168 N. W. 219; Arkansas M. R. Co. v. Pearson, 98 Ark. 399, 135 S. W. 917; Brown v. St. Luke's Hospital Assn. (Colo.), 274 Pac. 740; Roberts v. Ohio Valley General Hospital, 98 W. Va. 476, 127 S. E. 318; Deming Ladies' Hospital Assn. v. Price, 276 Fed. 668.

In Emery v. Jewish Hospital Association, 193 Ky. 400, 236 S. W. 577, decided in 1921, the question of liability to an employee of a charitable institution for injury due to negligence of the association was the issue involved. The plaintiff, a boy fifteen years of age, had been employed by the defendant association to operate an elevator in defendant's hospital and was injured while in performance of his duties, the injury being due to negligence of the association. The court in a well considered opinion, in which many authorities are reviewed, held the association exempt from liability upon the principle that defendant association was incorporated for the purpose of conducting a hospital and its funds were held in trust and expended for that purpose, and "that it is not liable in damages for the negligent acts of its managers, servants or employees, to any persons whatsoever." The court further said:

"This principle is adopted, for the reason that the funds of such an institution are donated to it or devised to it in trust, that they will be expended for the charitable purpose of ministering to the poor and needy sick and no other, and such corporation is a trustee of such funds for such purposes, and it nor its trustees or officers receive any profit from its operation, and while it is not held that according to the ordinary principles governing the administration of a trust, these funds might not be diverted to the payment of damages incurred in its administration, they should not be diverted to any such purpose. The diversion of such funds in such a way would probably destroy the institution, and a wise public policy forbids such a result. It is to the interest of the public that such institutions be maintained and a principle which requires the interest of an individual to be subordinated to the good of the public is not a stranger to our legal principles. It probably might be said that it is a hard rule, which exempts such an institution from liability to a stranger, or to an employee, but it only works the same hardship upon a stranger or employee, as the principle which exempts a governmentally conducted charity from any liability to them, and the appellee is doing the same service as such an institution governmentally conducted might do." [Page 407.]

In Betts v. Y. M. C. A., 18 Pa. Super. Ct. 545, the plaintiff was injured by the fall of a chandelier in the defendant's lobby while she was trimming it for the holidays. The defendant association was held to be a charity and exempt from liability.

In Farrigan v. Pevear, 193 Mass. 147, 78 N. E. 855, the defendants were trustees of an unincorporated society maintained for the purpose of affording an education and maintenance to destitute boys, therefore a charity. The plaintiff was an employee and was injured by reason of the unsafe condition of the place in which he was put to work. The defendant trustees were held exempt from liability. It seems to have been conceded that the defendant trustees were not themselves guilty of active negligence and that if there was negligence it was that of agents and servants of the defendants acting in the absence of defendants and without their knowledge or direction. The grounds on which the discussion is based include the trust-fund doctrine, and the fact is also referred to that it was not shown that there had been any negligence in the selection of such agents and servants.

But in the later case of Roosen v. Peter Bent Brigham Hospital, supra, the same court refused to recognize a distinction between liability or negligence of inferior agents and that of trustees or managing officers. The court, correctly we think, said (235 Mass. l. c. 70):

"There is no sound distinction in reason between the liability of a hospital for the negligence of its inferior agents and its liability for the carelessness of its managers. The conduct of both relates to the execution of the charity. The inferior agents usually work for pay, while the managing officers as a matter of common knowledge generally undertake the administration of the public charity without compensation, solely out of public spirit in a desire to serve the general welfare. If the hospital is held responsible for their acts of negligence, the funds devoted to the relief of suffering humanity must be diverted in the one instance to the same extent and manner as in the other to the payment of claims wholly foreign to the purposes of the public trust." [See also Foley v. Wesson Memorial Hospital, 246 Mass. 363, 141 N. E. 113.]

In the following cases, charitable associations were held exempt from liability for injury caused by negligence of the association or its servants to strangers, that is, to persons who were neither employees nor beneficiaries of the association, viz., Foley v. Wesson Memorial Hospital, supra, distinguishing Holder v. Mass. Horticultural Society, 211 Mass. 370, 97 N. E. 630, and other Massachusetts cases; St. Mary's Academy v. Solomon, 77 Colo. 463, 238 Pac. 22, 42 A. L. R. 964; Webb v. Vought and Salvation Army, 127 Kan. 799, 275 Pac. 170; Loeffler v. Trustees of Sheppard and Enoch Pratt Hospital, 130 Md. 265, 100 Atl. 301; Bachman v. Y. W. C. A.,

179 Wis. 178, 191 N. W. 751, 30 A. L. R. 448; Vermillion v. Woman's College, 104 S. C. 197, 88 S. E. 649.

On the other hand, in some jurisdictions such institutions are held liable for negligent injury to employees. For decisions so holding, see: Hewett v. Woman's Hospital Assn., 73 N. H. 556, 64 Atl. 190, 7 L. R. A. (N. S.) 496; Bruce v. Central M. E. Church, 147 Mich. 230, 110 N. W. 951, 10 L. R. A. (N. S.) 74 (injury to employee of contractor who was repairing church); Hordern v. Salvation Army, 199 N. Y. 233, 92 N. E. 626, 32 L. R. A. (N. S.) 62; McInery v. St. Luke's Hospital Assn., 122 Minn. 10, 141 N. W. 837; Armendarez v. Hotel Dieu (Tex.), 145 S. W. 1030; Winnemore v. Philadelphia, 18 Super. Ct. 625; Gamble v. Vanderbilt University, 138 Tenn. 616, 200 S. W. 510, in which case plaintiff's husband was a tenant of an office building of the defendant used chiefly to produce revenue, which income was used in carrying on its educational work, and was killed by the falling of a defective elevator.

In McInery v. St. Luke's Hospital Assn., supra, the court, while holding that the duty to guard dangerous machinery devolved upon a charitable association as upon any other employer and that liability attached for injury to an employee resulting from negligence in that respect, further intimated that the trust funds of the institution could not be applied to the payment of the verdict obtained. The court said:

"Nor are we to be understood as holding that the trust funds of the defendant may be applied to the payment of this verdict. The question is not involved. Defendant is not supported exclusively from such funds. On the contrary its maintenance would seem from the evidence to come principally from patients who pay for services rendered them."

And in Gamble v. Vanderbilt University, supra, a similar suggestion is made, viz., that a judgment for plaintiff could not be levied upon or collected out of "the university grounds or buildings, or any property therein or thereon located capable of use for the conduct of the charity," and said further: "It should be noted that in this class of cases the court will not permit judgment to be rendered when it is apparent there is no property out of which it can be collected."

With the utmost respect for the courts which made those suggestions, the ground of distinction seems to us hardly satisfactory. Many, perhaps most, courts which deny liability of a charitable hospital to a patient who pays for services received, say that the payment made by the patients is to be regarded as a contribution to the funds of the institution and the patient, notwithstanding such payment, is a recipient of the benefits of the charity. Why, then, should not such contributions logically be treated as trust

funds, in jurisdictions which recognize the trust-fund doctrine, the same as other contributions to the fund? And if an institution has an endowment fund which is invested in income-producing property, the income from which is used solely for carrying on its charitable work, it would seem that such income is impressed with the same trust character as the corpus of the fund. Such institutions can not function without using money. If the money is donated or contributed from time to time, it is for the purpose of enabling the charity to function. If the institution has been endowed it is not contemplated that the endowment fund shall be expended, but that it shall be invested so as to produce an income and that the income shall be used to carry on the charity. Logically, it seems to us that to take the income in such cases for satisfaction of damage claims would amount to a diversion of trust funds, upon the same principle as would a taking of the property that produced the income. In either instance the practical result would be to deprive the institution of the means wherewith to effectuate the purpose of its organization.

In Gable v. Sisters of St. Francis, 227 Pa. 254, the plaintiff was a pay patient injured through the negligence of a nurse in defendant's hospital, which was a charitable institution, but also accommodated pay patients, the income derived from that source being used in carrying on the charitable work. The argument was advanced that plaintiff should be allowed to recover and to collect her judgment out of the income derived from pay patients. Denying that contention the court said:

"The argument overlooks the fact that every dollar received by the defendant corporation, from whatever source, is stamped with the impress of charity. For what did these plaintiffs pay? For accommodations which the hospital was enabled to provide through the use of money charitably donated to it. The room, the bed, the furnishings and conveniences for which the plaintiff paid are all of them the direct and immediate product of the voluntary donations it received. It follows that the money that the hospital receives from its pay patients is as strictly the increment of the charitable donations it has received as would be the interest on the money given it if invested on loan." [l. c. 261.]

While it must be conceded that there are strong arguments in favor of holding a charitable organization liable for negligent injury to a servant or to a stranger, or for that matter even to a recipient of its service who pays therefor, it can hardly be said that there is a decided weight of authority either in favor of or against such holding. The courts of this State, upon careful consideration, have decided that it is better public policy to hold them exempt and have adopted what has sometimes been called the trust-fund doctrine, viz., that the funds of such institutions

constitute a trust fund for the charitable purposes of the organization which may not be diverted to the payment of claims for damages for injuries due to negligence of managers, officers and servants of the institution, thereby depleting the fund. In a well considered opinion, in which numerous authorities are reviewed, the Kansas City Court of Appeals, in Adams v. University Hospital, 122 Mo. App. 675, 99 S. W. 453, held that a charitable hospital association was not liable to a "pay patient" who was injured through the negligence or incompetence of a nurse while being treated in the hospital, the court holding that the hospital was exempt from liability whether injury was due to negligence of a servant in whose selection due care had been used or to negligence of the managing authorities in selecting an incompetent servant; and holding further that the fact that the patient paid for the service and attention received made no difference, the payment being treated as in the nature of a contribution to the support of the institution. The court said:

"It is manifest that if we uphold a rule which would make an institution of charity liable to a patient who has been injured by an incompetent servant, negligently selected, we destroy the principle we have endeavored to make plain, that charitable trust funds cannot be diverted from the purposes of the donor."

The St. Louis Court of Appeals, in Whittaker v. St. Luke's Hospital, 137 Mo. App 116, 117 S. W. 1189, applied the same doctrine of exemption in a case of injury to a servant. In that case the plaintiff was an employee of the defendant hospital and was injured while working with an ironing machine or mangle, operated by steam power, and which it was alleged was out of order in that a guard designed to protect the operator's hand from injury was not in proper place and the machinery otherwise out of repair. It was conceded that had the plaintiff been a patient injured while receiving the benefit of the institution, the latter would not have been liable. But it was contended that as she was a servant a different rule should obtain. The court, after careful consideration of the authorities on the subject, denied the contention. The court, among other authorities, referred to Murtaugh v. St. Louis, 44 Mo. 479, and after quoting from the latter, said:

"It is evident from the quoted passage the Supreme Court considered the exemption of a public charity from liability for the negligence of its officials and employees, rested on the fact that its corporate franchise and the funds which kept it alive, were conferred on the corporation by the sovereignty for the public welfare and ought not to be diverted to pay claims for damages. That is like the principle on which institutions of a charitable character privately endowed ought to be exempted, and in several authoritative decisions were, though different reasons have been assigned

by other courts. Two rules of law, both founded on motives of public policy, come into conflict here; the rule of *respondeat superior* (or if not technically that, one akin to it) and the rule exempting charitable funds from executions for damages on account of the misconduct of trustees and servants. As both rules rest on the same foundation of public policy, the question is whether, on the facts in hand, the public interest will best be subserved by applying the doctrine of *respondeat superior* to the charity, or the doctrine of immunity; and we decided this cause for respondent because, in our opinion, it will be more useful on the whole not to allow charitable funds to be diverted to pay damages in such a case; and, moreover, the weight of authority is in favor of this view, as expressed not only in cases where the parties seeking damages were patients in the institution, but where they were not." [Page 119.]

Both the Adams and Whittaker cases, supra, have been cited with approval by this court as correct statements of the law. [See Nicholas v. Evangelical Deaconess Home, supra; Cochran v. Wilson, 287 Mo. 210, 225, 229 S. W. 1050.] We are not persuaded that it would be the better public policy to abandon the doctrine heretofore followed in this State.

There can be no logical reason why the same rule of exemption applied to a charitable hospital association should not apply to a charitable association such as the Y. W. C. A. There is no doubt that it is a strong influence for good in a community. While not an agency of the State, in the strict sense, its work and its influence aid government. Whatever tends to elevate the moral, educational and physical standards of its citizens is a benefit not only to those immediately affected but to the community and to the State. That which tends to increase efficiency and to reduce ignorance and poverty among its citizenship tends to that extent to relieve the body politic from economic burdens which otherwise in the cause of humanity and good government would fall upon it. See Bachman v. Y. W. C. A., supra, holding that the Y. W. C. A., being, as was conceded in that case, a public charitable corporation, not operated for private gain, "is therefore in the same class and stands on the same footing as do hospitals which are conducted as public charitable institutions . . ."

It is suggested that even if we adhere to the rule of exemption followed in the Missouri cases above referred to, it should not be applied in this case because the building in which plaintiff was hurt was being used largely for the purpose of producing revenue and plaintiff when injured was or just had been serving a tenant rather than a patron of the association. While it is true the elevator served tenants of the building and plaintiff had just taken

up an employee of one of the tenants, it is also true that the elevator was used by the association in direct connection with its charitable work, as its reading and rest rooms were on the third floor. It was at that floor that the alleged defective device was located and plaintiff had taken the passenger in question, a young woman, to that floor. On the facts presented it cannot be said that the elevator and the defective appliance which caused plaintiff's injury were not used in connection with and as facilities for the carrying on of the charitable work of the association as much as was the case with the defective ironing machine in Whittaker v. St. Luke's Hospital, supra. The fact that the elevator also served tenants in the building and that the passenger who had just been taken up happened to be an employee of a tenant rather than a recipient of the benefits of the association, would not, we think, upon the facts shown, justify the application of a rule different from that which would apply had the use of the elevator been confined to portions of the building occupied and used by the association only in the direct carrying on of its charitable activities. Our conclusion is that under the evidence presented the Y. W. C. A. is not liable and that as to it the demurrer was properly sustained.

III. We think that plaintiff also failed to present a submissible case against the individual defendants. It is not shown by the evidence, but seems to have been regarded by both sides as conceded in the trial that the nine men were trustees of the defendant corporation. There is neither admission nor proof as to any connection of defendants Mrs. Gorton and Mrs. Jones with the association, nor as to any duties toward plaintiff devolving upon or performed by them. Mrs. Gorton may have been joined as defendant on the theory that as president of the association (if such was the fact) she would be ex-officio a member of the board of trustees. Plaintiff's brief in this court indicates that she proceeds against all of the individual defendants on the theory of their being trustees and we shall consider the question of their liability from that standpoint.

Plaintiff rests her case against the individual defendants solely upon a showing of the duties devolving upon them according to the articles of association, constitution and by-laws of the corporation. With slight modifications we adopt plaintiff's statement of the substance of the applicable provisions. The articles of association provide for two boards, a board of managers and a board of trustees, and provide: (a) the board of managers, composed of women chosen from the active membership, shall manage the business of the corporation, shall control its policy and work and employ and discharge all paid officers, agents and others whose services are required; also that they shall choose the trustees and receive from

them the net amount of all income from trust funds and investments above certain payments to be made and expenses to be met by the trustees; but that the board of managers shall not create any obligation which shall become a lien or charge against any of the real estate of the corporation, without the joint consent of the board of trustees; (b) that the board of trustees shall invest the trust funds of the corporation and manage its property; that they shall collect all its income from interest and investments, and apply the same to the payment of interest on permanent loan and legal charges and assessments against the property, to insurance upon the corporate property and to keeping it in good repair, and pay whatever remains of such income over to the treasurer of the corporation monthly, to be used as the board of managers shall direct.

The constitution and by-laws provide: (1) That there shall be two boards, a board of directors and a board of trustees; (2) That the board of directors shall be composed of not more than thirty-nine members of the association, who shall be chosen from the Protestant churches, and that the officers, superintendents of departments and chairmen of standing committees shall be members of the board of directors, which board shall organize the departments and branches, appoint all employed officers, supervise all the work of the association and make all contracts and leases; (3) That the board of trustees shall be composed of not fewer than nine men chosen from members of the Protestant churches and that the president, treasurer, general secretary and chairman of the finance committee of the board of directors shall be ex-officio members of the board of trustees; that the title to all property shall be vested in the name of the association, but that only by authority of the board of trustees shall debts, obligations or mortgages be made chargeable to the real property of the association; and that the board of trustees shall cooperate with the board of directors in formulating and executing campaign plans for raising money and shall hold all trust funds and turn over to the association the income from such funds for the purposes for which they are held.

It is not claimed that the individual defendants were members of the board of managers or directors.

Respondent trustees contend that, if it be assumed that any duty involved upon them with respect to the alleged unsafe conditions complained of, the neglect of such duty on their part would be merely non-feasance for which they would not be liable to plaintiff, who was not their employee. Plaintiff asserts that such neglect would amount to misfeasance, for which the trustees would be liable to her. The rule invoked by appellant is thus stated in McGinnis v. C. R. I. & P. Ry. Co., 200 Mo. 347, 357, 98 S. W. 590, cited in her brief:

594

"There are two classes of cases falling under this doctrine, one wherein the master is held liable for the non-feasance or negligent failure of the servant to perform a duty, and the other where the master is held liable for the misfeasance or negligent performance of a duty. In the one case the servant simply negligently fails to do what should have been done, and in the other he negligently does what should have been done and properly done.

"In the first class of cases, the servant is not liable to third parties, but the master under the rule of *Respondeat Superior* is liable. In the second class both are liable to third parties. The servant, because he actually does the wrongful act occasioning the injury. The master, because under the rule of *Respondeat Superior*, he is liable for the negligent act of the agent done within the scope of his employment, and in the course and performance of his master's business. In either case the master has recourse upon the servant as for breach of duty to the master."

In Orcutt v. Century Bldg. Co., 201 Mo. 424, 99 S. W. 1062, the doctrine is applied to a trustee (corporation) which by contract had and which exercised active management and operation of a building in which the plaintiff was injured, it was alleged, because of the defective condition and negligent operation of an elevator. The court, through GRAVES, J., said (l. c. 447):

"Under this contract the whole management of the building is placed in the hands of the Mississippi Valley Trust Company and the evidence tends to show that it immediately took such control, having its own sub-agents to look after the matter. It paid the operator of the elevator in question. It paid for repairs, when such were made. In fact, it paid all employees. When it undertook the management of this building from its principal, it undertook to do for the principal a particular work, and after it entered upon the performance of that work, any act which it did, whether by omission or commission, was misfeasance. *After making this contract, had it stood aloof and refused to take the management of the building, and in so doing, thereby failed to do something which resulted in injury to a third person, it would not have been liable, because we would thus have mere non-feasance.* But after it assumed its management and thereby commenced to do the thing it contracted and agreed to do, then as said before, acts of omission or commission constitute misfeasance, or a failure to properly do the things which it had in the line of its duty commenced to do." [Italics ours.]

Applying the principle thus stated, we find in the instant case no showing of facts upon which the trustees can be held liable to plaintiff. The management by the trustees of the corporation's property contemplated by the articles of association seems to be management from the standpoint of conservation and investment

rather than active control and management in the use of the property, the latter being committed by the charter and by-laws to the board of managers or directors. Such seems to have been the construction given the charter provision by the association and the trustees in the by-laws adopted, in accordance with which we must assume the business of the association was conducted. And whatever may be the charter *powers* and duties of the trustees there was no showing or attempt to show that they ever exercised or attempted to exercise any control, supervision or management of the building or the elevator. Plaintiff in her petition states that the defendant corporation employed her, that it (not the trustees) owned, rented and operated the building, collected the rents and owned, maintained and operated the elevator, "in all respects as elevators are owned, maintained and operated by other owners in other office buildings in said city." It was not even alleged or proved that the trustees knew or should have known of the alleged unsafe conditions to which plaintiff attributes her injury. They did not lease the building or any part thereof to tenants and had nothing to do with plaintiff's employment. If it be conceded that under the charter they had the power and it was their duty to manage and supervise the property in the sense of seeing that the elevator and other appliances therein were safe for use by occupants and their employees, yet if they never undertook or assumed to act in that regard or to exercise such powers, either themselves or through their agents, it was mere non-feasance for which they are not liable to plaintiff. [Orcutt v. Century Bldg. Co., supra; McGinnis v. C. R. I. & P. Ry. Co., supra; O'Neil v. Young, 58 Mo. App. 628; Williams v. Dean, 134 Iowa, 216, 111 N. W. 931, 11 L. R. A. (N. S.) 410; Paterlini v. Memorial Hospital Assn., 247 Fed. 639.]

In Gamble v. Vanderbilt University, supra, strongly relied on by appellant as sustaining liability of the trustees, the court was considering the sufficiency of a petition, demurrer to which had been sustained. The court said that "under a fair construction of the language of the declaration we think it must be assumed that the details of operation, as, for example, the running of the elevator, were properly devolved upon subordinate servants selected by them (defendants), under the oversight and control of the executive committee, and also that they held under their control and supervision the fitness and efficiency of the elevator . . ." The court further said:

"It was not merely an act of non-feasance for which there was responsibility of the intermediate servant to the master only, as, for example the failure to have the elevator repaired, but a case of actual misconduct, suffering the elevator under their control to be operated that day when they knew it was unsafe and unfit for

operation, thereby knowingly subjecting third parties to a great hazard. It was a case not of non-feasance, but of misfeasance. Having this dangerous agency under their control, they owed to third parties the duty of operating it in such manner as not to injure them. According to the averment, they knowingly set in motion a dangerous agency which they knew, owing to its defects, would probably injure any passenger riding on it. Under such circumstances they became active participants in the wrong inflicted, and cannot escape liability on the ground of their representative character.''

In the instant case plaintiff's evidence wholly fails to present a situation such as the court was discussing in the Gamble case.

We have examined other authorities cited by appellant on this point and without taking time and space to discuss them, it is sufficient to say that we do not consider them in point nor as announcing principles with which our conclusion conflicts.

From the foregoing it follows that in our opinion the ruling of the trial court was right, and the judgment is affirmed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.