HOMER R. DILLE, Appellant, v. ST. LUKE'S HOSPITAL.—No. 39641.—
196 ·S. W. (2d) 615.

Division Two, September 9, 1946.

Motion for Rehearing or to Transfer to Banc Overruled, October 14, 1946.

*Clif Langsdale* and *Clyde Taylor* for appellant.

438

*Madden, Freeman, Madden & Burke* and *Ralph M. Russell* for respondent.

440

 LEEDY, J.—This is an action for personal injuries alleged to have been suffered by plaintiff while a patient in, and resulting from the negligence of the agents and servants of, the defendant hospital. Defendant, by answer, denied the existence of any negligence but claimed immunity from liability because of its status as an incorporated charity under Sec. 5436 et seq., R. S. '39, and corresponding sections of Mo. R. S. A. The reply admitted the corporate existence of defendant as a charity, and alleged the Aetna Casualty and Surety Company had issued to defendant a policy of insurance by which it "agreed to pay, in behalf of defendant herein, all sums which said defendant should become obligated to pay by reason of the liability imposed upon it for damages . . . up to the sum of $10,000.00. Said insurance company further agreed to defend in the name, and on behalf of said defendant any suit . . . and to furnish attorneys and investigators at no cost to the defendant herein, and to pay the court costs of this suit." It further alleged that the attorneys defending this case "are being compensated by said [insurance] company for so doing; that they are not the regular attorneys for St. Luke's Hospital and are not being compensated for the defense of this law suit by St. Luke's Hospital." It averred that by reason of the foregoing, "the defendant is directly and completely insured by the said insurance company against the payment of any sum whatever because of this suit," alleged the insurer's solvency and ability to fulfill the obligations of the policy, and concluded with a prayer for judgment as in the petition. Defendant's motion for judgment on the pleadings was sustained, judgment was rendered in its favor, and plaintiff appealed. The amount involved, $10,000.00, gives this court jurisdiction.

The ultimate question for determination is the effect of the liability insurance policy with respect to the damages claimed by plaintiff. Except for such insurance, the defendant would not otherwise be liable.[1] Alive to this consideration, plaintiff advances the contention that under the Missouri cases, the "sole reason and basis" for the immunity of charities from tort liability is the trust fund doctrine; that that doctrine does not apply to the facts of this case because the policy of insurance effectively protects against the diversion of the trust funds of the hospital to the payment of plaintiff's claim; and, hence, the reason for the rule of immunity having failed, the rule itself fails. On the other hand, defendant contends that the basis of its immunity, as successfully claimed below, is, under the adjudicated cases, that of public policy, so that the presence of liability

---

[1]Adams v. University Hospital, 122 Mo. App. 675, 99 S. W. 453; Whittaker v. St. Luke's Hospital, 137 Mo. App. 116, 117 S. W. 1189; Nicholas v. Evangelical Deaconess Home, 281 Mo. 182, 219 S. W. 643; Roberts v. Kirksville College (Mo. App.), 16 S. W. (2d) 625; Eads v. Y. W. C. A., 325 Mo. 577, 29 S. W. (2d) 701.

insurance does not destroy, impair or affect its immunity, and is, therefore, wholly immaterial. Thus we are not asked to examine into the soundness of the Missouri cases dealing with the immunity of charities from tort liability, but the scope of our review is limited to, and insofar as plaintiff's contention is concerned, the case turns on, a determination of the foundation on which such immunity rests. Witness the plaintiff's brief: ''We have not asked that the so-called trust fund doctrine be overruled or even modified. We do not come to destroy the law, but to uphold it. We simply say that the trust fund doctrine does not apply to the facts of this case. It will be time enough to present the question of whether the trust fund doctrine should be continued or abolished in this state when some case arises that directly involves such question. It is not involved in this case.''

The question of whether a charity, such as the defendant, should be answerable in damages for the negligence of its agents and servants is one upon which there is great diversity of opinion. The theories of exemption vary in the different jurisdictions, but in general they seem to fall under these distinct heads: (1) Public policy; (2) the trust fund doctrine; (3) the inapplicability of the rule of respondeat superior; (4) the doctrine of implied waiver; and (5) performance of a public or quasi-public function. As stated in President and Directors of Georgetown College v. Hughes, 76 U. S. App. D. C. 123, 130 Fed. 2d 810, in an opinion (concurred in, except as to result, by two others of the six-judge court) by Justice Rutledge (now an Associate Justice of the Supreme Court of the United States): ''Paradoxes of principle, fictional assumptions of fact and consequence, and confused results characterize judicial disposition of these claims. From full immunity, through varied but inconsistent qualifications to general responsibility is the gamut of decision. The cases are almost riotous with dissent. Reasons are even more varied than results.''

The Missouri cases are by no means crystal clear on the question of the precise ground upon which immunity rests, and the five cited in marginal note (1) and Stedem v. Jewish Memorial Hospital (Mo. App.), 187 S. W. 2d 469, are the only ones involving the point. The first of these, Adams v. University Hospital, was decided in 1907 by the Kansas City Court of Appeals. It involved an injury sustained by a patient. Indeed, it was of the same nature as that in the case at bar, e. g., burning by hot water bottles while the patient was under an anesthetic. The issues there presented are reflected by the opinion in stating the contentions of the respective parties, as follows: ''Defendant's main contention is that it is a benevolent or charitable institution and as such is not liable to an action for damages caused by the acts of its employes; that, as such an institution, it is exempt from application of the doctrine of respondeat superior. Defendant insists it is neither liable for the negligence of its servants, nor for its own negligence, if any, in undertaking to select competent servants.

Upon the other hand, the plaintiff contends that there is liability, if there was negligence either of the servant, or of the defendant in selecting a competent servant." Plaintiff there recovered a judgment, which on appeal was reversed outright. There is language in the opinion which is referable to either of several theories of nonliability. For example: "Every member of the public is interested in the building up and maintenance of a charitable institution designed for the alleviation of human suffering, and every one may be supposed to be concerned in such institution, and to be a party to a line of action or conduct which would disable every other from doing anything which has a tendency to prevent the institution from performing the functions intended by its founder. The state itself is concerned that its citizens may be restored to health, and to that end may have places always open where those in need may obtain relief." This is undoubtedly consistent with the idea of public policy as the underlying reason for immunity. The opinion then continues, "So it may be said that any citizen who accepts the service of such institution . . . does so upon the ground, or the implied assurance, that he will assert no complaint which has for its object, or perhaps we should say for its result, a total or partial destruction of the institution itself." We do not regard this language as inconsistent with the public policy concept, but it is also in keeping with the theory of implied waiver or assent to immunity by the acceptance of the benefits of a charity as the basis of immunity, a principle stated in 10 Am. Jur., Charities, sec. 145, p. 694, as follows: ". . . A person who accepts the benefit of a private or public charity enters into a relationship which exempts his benefactor from liability for the negligence of his servants in administering the charity, if the benefactor has used due care in selecting those servants."

The opinion proceeds thus: "If an organization for charitable purposes founded upon the bounty of others who supply funds for the purpose of administering relief to those in need of relief, and of extending aid, care, and protection to those who have no one to call upon by the ties of nature, may have its funds diverted from such kindly purpose, would it not inevitably operate to close the purses of the generous and benevolent who now do much to relieve the suffering of mankind? . . . That funds supporting organizations for charity cannot be thus diverted, in other words, that charitable institutions or corporations are not liable for the negligence of an employe, nor for the want of care in the selection of an employe, is sustained by authority and by reason." This language has some of the elements of both the trust fund and public policy theories, which are, respectively, stated in 10 Am. Jur., Charities, sec. 146, sec. 147, as follows: "The rationale of the [trust fund] doctrine . . . is that if the charity or trust fund could be used to compensate injured parties for the negligence of the agents or servants of the

organization, the fund would be diverted to purposes never intended by the donor, and the charitable purposes of the creators or founders frustrated. The policy underlying this theory, reduced to its essence, seems to be that the preservation of charitable trust funds is more desirable than a right to compensation from such funds for an injury inflicted by the operation of the charity.'' Sec. 147 dealing with public policy as the basis of immunity, says: ''Another closely allied theory to the trust fund theory is one which denies recovery to recipients of a charity upon broad grounds of public policy, holding that inasmuch as such institutions are inspired and supported by benevolence and devote their assets and energies to the relief of the destitute, sick, and needy, the common welfare requires that they should be encouraged in every way and held exempt from liability for tort; and that to do otherwise would operate to discourage the charitably inclined, dissipate the assets of such institutions in damage suits, and ultimately, perhaps, destroy them.''

In concluding that the defendant hospital might successfully claim immunity, and at the end of the discussion on the point, the opinion says: ''To repeat a thought already suggested, every one, in the present or the future, coming within the object of a charity, has a right to the enjoyment of its benefits, and no one has a right to appropriate ▇▇▇ to himself in settlement of claims, the fund whereby those benefits are secured. To permit it to be done would be not only setting aside the purpose of the donor, but would, in its results, allow the claim of one person to exclude the rights of all others who may come after him. It would be a matter of grave concern and regret if funds set apart for support of our charitable institutions should be made subject to the assaults of the damage claimant, and be called upon, not only for compensatory recompense, but to stand for punishment in the way of exemplary damages. Especially would it strike one as unfortunate, when it is realized that such claimant has his primary right to hold to the strictest accountability the individual who does him the injury for which he makes complaint, and that in denying him the right to impoverish benevolence we do not deny him a remedy against the actual wrongdoer. So the weight of authority in this country supports Heriot's Hospital v. Ross [12 Clark & F. 507] as being the rule which commands itself, not only because it carried out the donor's intention, but because it is more reasonable and just, *and better subserves an enlightened public policy.* (Citing eight foreign cases.)'' [Italics, the present writer's.] Later, it goes on to say, ''But it is manifest that, if we uphold a rule which would make an institution of charity liable to a patient who has been injured by an incompetent servant, negligently selected, we destroy the principle we have endeavored to make plain, that charitable trust funds cannot be diverted from the purposes of the donor. For it can make no difference, so far as the integrity of the fund is concerned, whether

it be sought after by one who is injured by the negligence of a servant, or the negligent selection of such servant." So much for the Adams case.

The next, in chronological order, is the Whittaker case, supra, decided by the St. Louis Court of Appeals in 1908. The plaintiff in that case was not a patient or beneficiary, but an employe. Judgment for defendant, affirmed on appeal. The Adams case decided 23 months previously was not cited, nor otherwise referred to. It was there said: "Two rules of law, both founded on motives of public policy, come into conflict here: The rule of respondeat superior (or if not technically that, akin to it), and the rule exempting charitable funds from executions for damages on account of the misconduct of trustees and servants. As both rules rest on the same foundation of public policy, the question is whether, on the facts in hand, the public interest will best be subserved by applying the doctrine of respondeat superior to the charity, or the doctrine of immunity; and we decide this cause for respondent because in our opinion it will be more useful, on the whole, not to allow charitable funds to be diverted to pay damages in such a case . . ."

Next came Nicholas v. Evangelical Deaconess Home, 281 Mo. 182, 219 S. W. 643, decided in 1920, by Division I of this court. It involved a pay patient who suffered severe burns when a hospital nurse gave carbolic acid, instead of alcohol, for a rub. Judgment for defendant. On appeal, the court held, on the authority of numerous cases cited, including the Adams and Whittaker cases, that "defendant, being a charitable organization, is not liable for injuries caused to its patients by the negligence of its trustees, servants or employes." In our state reports, the syllabus (No. 2) indicates the ground of such holding as the trust fund doctrine. ("The [trust] funds . . . cannot be diverted or absorbed by claims arising from the negligence of the trustees or employees.") Whereas in the Southwestern, the syllabus, (No. 4), states the ground as "the doctrine of respondeat superior not applying in such cases." The text of the court's discussion on the question of liability follows: "In none of the decisions above noted is *the exemption of charitable institutions from the rule of respondeat superior* more clearly and satisfactorily set forth than in the two opinions from our own Courts of Appeal, to which we have referred. [Italics, the present writer's.] In Adams v. University Hospital, 122 Mo. App. 675, 99 S. W. 453, Judge Ellison, delivering the unanimous opinion of the court, cites and reviews, in extenso, the decisions in this country and in England, and shows that ever since the decision of the House of Lords, in the case of Heriot's Hospital v. Ross, 12 Clark and F. 507, the law has been firmly established by the great weight of authority that the funds of a charitable hospital or association are trust funds devoted to the alleviation of human suffering, and cannot be diverted nor absorbed by claims

arising from the negligence of the trustees or their employes in administering the trust or charity. In Whittaker v. Hospital, 137 Mo. App. 116, 120, 117 S. W. 1189, 1190, Goode, J., delivering the opinion of the court, again thoroughly examines and considers the question and thus announces the law: [Here follows the question we have already set forth from the Whittaker case.]

"We are satisfied with these pronouncements of our Courts of Appeal, and hold that they announce the true rule of law to be applied in such cases."

Roberts v. Kirksville College of .Osteopathy was decided by the Kansas City Court of Appeals in 1929. Plaintiff, a pay patient, appealed from an adverse judgment, which was affirmed, the court holding: "The agents of the charity who do the negligent acts which result in a plaintiff's injury are liable therefor; but the doctrine of respondeat superior does not apply to defendant, because it is a charity and holds all its funds in trust to carry out the benevolent purposes for which it was chartered by the state. The reasons for this rule need not be discussed, because they are fully explained in the case of Nicholas v. Evangelical Deaconess Home, etc., 281 Mo. 182, 219 S. W. 643, and authorities there cited."

This brings us to Eads v. Y. W. C. A. et al., 325 Mo. 577, 29 S. W. 2d 701, decided in 1930 by this division. Plaintiff in the case at bar emphasizes and relies on the following language of that case as indicating the establishment of the trust fund doctrine as the sole foundation for the rule of immunity: "The courts of this state, upon careful consideration, have decided that it is better public policy to hold them exempt, and have adopted what has sometimes been called-the trust fund doctrine, viz., that the funds of such institutions constitute a trust fund for the charitable purposes of the organization which may not be diverted to the payment of claims for damages for injuries due to negligence of managers, officers and servants of the institution, thereby depleting the fund."

Plaintiff Eads was an employe, an elevator operator, whose injuries were alleged to have resulted from the negligence of defendants. Judgment went for defendant below, and on appeal it was affirmed. The opinion discusses the question of immunity at some length, and in noting the diversity of opinion on the question by the different courts, points out that "Different reasons have been assigned for exemption from liability, as that the property and income of charitable institutions constitute a trust fund for the charitable purposes of the organization which may not be depleted or diverted from such purpose, either directly by act of the trustees or managing officers or indirectly by payment of damages for their negligence; that it is better public policy to hold them exempt; that the doctrine of respondeat superior does not apply; that one accepting the service or benefit of such institution thereby impliedly consents to waive any claim for compensa-

tion for injuries he may receive through its negligence. Other grounds have been suggested. And it may be added that all of the different doctrines upon which nonliability of charitable associations has been placed by different courts have been criticised and excepted to by other courts." Following the language here invoked by plaintiff, and after reviewing the Adams and Whittaker cases the opinion recites: "Both the Adams and Whittaker cases, supra, have been cited with approval by this court as correct statements of the law. See Nicholas v. Evangelical Deaconess Home, supra; Cochran v. Wilson, 287 Mo. 210, 225, 229 S. W. 1050. *We are not persuaded that it would be the better public policy to abandon the doctrine heretofore followed in this state.*" (Emphasis supplied.)

"The term 'public policy', being of such vague and uncertain meaning, and of such variable quantity, has frequently been said not to be susceptible of exact or precise definition; and some courts have said that no exact or precise definition has ever been given or can be found. Nevertheless, with respect to the administration of the law, the courts have frequently quoted and often approved of the statement that public policy is that principle of the law which holds that 'no one' can lawfully do that which has a tendency to be injurious to the public or against the public good; . . . 'Public policy' has been said to be synonymous with 'policy of the law,' and also has been defined as 'the public good.'" 50 C. J. 857-858. "The term public policy is one of broad significance and cannot be comprehensively defined in specific terms. One of the best definitions perhaps is that of Justice Story, which applied the term to that which 'conflicts with the morals of the time, and contravenes any established interest of society.' [1 Story on Const., 675.] . . . An excellent definition is also found in Black's Law Dictionary, where it is said: 'The term "policy" as applied to a . . . rule of law . . . refers to its probable effect, tendency, or object, considered with reference to the social or political well-being of the State. Thus, certain classes of acts are said to be "against public policy," when the law refuses to enforce or recognize them, on the ground that they have a mischievous tendency, so as to be injurious to the interests of the State, apart from illegality or immorality.' If one will read the various definitions of this term in 6 Words & Phrases, 5813, he will get a good working definition in his mind, though he may not be able to formulate the same in words." State ex rel. Smith v. Bowman, 184 Mo. App. 549, 170 S. W. 700.

The Adams and Whittaker cases are cited in 11 C. J. 376 in support of this statement: "As has been seen, all the rules for exempting, either totally or to a limited extent, charitable institutions from liability for torts are based generally on public policy." They are again cited in the same section in support of this statement: "In others, nonliability is based on the ground that trust funds created

for charitable purposes should not be diverted therefrom to pay damages arising from torts of servants." Justice Rutledge's opinion cites the Adams and Eads cases as being founded on the trust fund theory. 130 Fed. 1. c. 824. And the Virginia Supreme Court of Appeals in Weston v. Hospital of St. Vincent, 107 S. E. 785, 23 A. L. R. 907 so regarded the Missouri rule, for it was there said: "The second, or 'trust-fund,' theory is held, more or less, in its integrity, in Illinois . . . Missouri, . . . and other states." The Adams case is cited in their footnote.

John A. Appleman, Esq., the author of "Insurance Law & Practice" (1941), and "Automobile Liability Insurance" (1938), in an article, "The Tort Liability of Charitable Institutions" appearing in 22 A. B. A. J. p. 48, regards the Missouri cases as "coupling the more desirable ground of public policy [citing the Eads case] with the more common one of the trust fund doctrine in order to reach the desired result." In Cochran v. Wilson, 287 Mo. 210, 226, 229 S. W. 1050 (involving liability in tort of a school board) this division of the court reviewed the Nichols, Adams and Whittaker cases, and of them it said, "If it is against public policy as ruled in the foregoing cases to divert charitable funds, so-called, from other than the purpose for which they have been collected . . .," etc. The most recent construction of the rule is that by the Kansas City Court of Appeals in the Stedem case, where it was said: "In Missouri the ground for nonliability is based upon the trust fund and public policy theory. See Eads v. Y. W. C. A., 325 Mo. 577, 29 S. W. 2d 701, and cases cited therein."

While the cases seem to treat the two theories, trust fund and public policy, under separte heads, the distinction between them is more apparent than real. At bottom they are the same, the trust fund doctrine being, as some of the cases say, the "child" or "offspring" of the doctrine public policy. This is also true as to the nonapplicability of the rule of respondeat superior. The Virginia Supreme Court of Appeals in the St. Vincent Hospital case, supra, aptly stated the matter thus: "The determination of a number of courts . . . that there should be absolute immunity in all cases, and which came to be ▮▮▮▮ known as the 'trust-fund theory,' was nothing more than saying that the immunity was granted from reasons of public policy; that, on the whole, the public would be best served by the application of this theory." So understood, this disposes of plaintiffs contention respecting the foundation on which the rule of immunity rests, and as his whole claim was grounded thereon, it is unnecessary to notice the cases from states having qualified liability where the presence of insurance appears to have an effect. It may be added that the precise question here involved was presented in the Stedem case. The same cases, and the same

448

sections of the statute in relation to the insurance were urged there as here. We are in accord with the views there expressed. On the authority of that case, and because of the views hereinabove expressed, the judgment should be, and it is, affirmed. All concur.