Arthur SCHULTE, Appellant,

v.

MISSIONARIES OF LA SALETTE CORPORATION OF MISSOURI, a corporation, LaSalette Seminary, Jefferson City, Missouri, and Missionaries of Our Lady of La-Salette, a corporation, Ipswich, Massachusetts, Respondents.

No. 48443.

Supreme Court of Missouri,

Division No. 2.

Dec. 11, 1961.

Motion to Transfer to Court en Banc or for Rehearing Denied Jan. 8, 1962.

Anthony P. Nugent, Jr., Kansas City, and Henry BalkenBush, Linn, for appellant; Winger, Nugent & Rayburn, Kansas City, of counsel.

Rozier, Carson & Nacy, Jefferson City, for respondents.

EAGER, Presiding Judge.

Plaintiff filed this suit for personal injuries against Missionaries of LaSalette Corporation of Missouri, LaSalette Seminary, and Missionaries of Our Lady of LaSalette, a Massachusetts Corporation. The record does not show that the second defendant named is a separate entity, but a motion to dismiss was filed in its name. Plaintiff has expressly abandoned the action here as against the last-named defendant. Separate motions to dismiss were filed for each defendant, the trial court found that the petition failed to state a claim upon which relief could be granted, and the petition and the cause were dismissed. Plaintiff, after an ineffectual motion, appealed, but prosecutes the appeal only as against Missionaries of LaSalette Corporation of Missouri, to which we shall hereafter refer as the defendant. In support of its motion to dismiss defendant produced a witness who testified to certain more or less formal facts, none of which are contested. From this it was developed: that defendant, a Roman Catholic Order, owns the property in Jefferson City upon which a boys' seminary is located and operated; that this is operated solely for the training of youths as priests or missionaries to serve both in this and foreign countries; that the sole purpose is to spread the Catholic faith; that those students who are financially able to do so pay $250 per year, plus $25 for books, which does not begin to cover their actual expenses; that some pay less, and some pay nothing; that the Order solicits and receives donations, and the priests in the Order send in sums which they have received; that there is no profit whatever; that the swimming pool where plaintiff was injured (he alleges negligence in failing to warn that the pool was only partly full, and consequently a lack of proper supervision) was maintained for the students and faculty, with perhaps an occasional guest, but with no fees; it was not open to the public. In a rather vague answer this witness stated that he believed they did have a public liability insurance policy. It is in substance conceded that defendant is a true charitable corporation, organized under the "Benevolent, Religious" etc. statutes in 1948 (§§ 5436–5465 RS 1939, now Ch. 352, RSMo 1959, V.A.M.S.) and that it has and maintains no commercial activities whatever. Plaintiff was seriously injured but we need not develop that here. Since the suit was for damages in the amount of $125,000, we have jurisdiction.

Plaintiff very frankly attacks our whole doctrine of charitable immunity. Counsel say, in substance: that the rule at its inception in Missouri had no proper basis in law or public policy, that the legislature has in certain enactments declared a public policy to the contrary, and that the rule of stare decisis does not require the court to adhere to the doctrine. Certain more specific contentions will be referred to later.

■ Our cases declaring the doctrine of immunity are so well known to the Bar that we shall not review them individually in any great detail. In 1907 the Kansas City Court of Appeals decided Adams v. University Hospital, 122 Mo.App. 675, 99 S.W. 453. Therein (in a suit by a patient) it held: that such charitable funds constitute a trust for the alleviation of suffering and should not be diverted to the payment of damages; that patients, as beneficiaries of the trust, accept the benefits of a charity upon an implied assurance that they would

assert no complaint against it; and that to permit such diversions would tend to lessen contributions to the charity. It may fairly be said also that the court relied upon what it found to be a sound public policy, relying in part upon opinions which it cited from other states (loc. cit. 456). The Adams case has been followed in the following Missouri cases: Nicholas v. Evangelical Deaconess Home and Hospital, 281 Mo. 182, 219 S.W. 643; Whittaker v. St. Luke's Hospital, 137 Mo.App. 116, 117 S.W. 1189; Roberts v. Kirksville College of Osteopathy & Surgery, Mo.App., 16 S.W.2d 625; Eads v. Young Women's Christian Ass'n, 325 Mo. 577, 29 S.W.2d 701; Stedem v. Jewish Memorial Hospital Ass'n of Kansas City, 239 Mo.App. 38, 187 S.W.2d 469; Dille v. St. Luke's Hospital, 355 Mo. 436, 196 S.W. 2d 615; Kreuger v. Schmiechen, 364 Mo. 568, 264 S.W.2d 311 (involving a church); and Blatt v. George H. Nettleton Home for Aged Women, 365 Mo. 30, 275 S.W.2d 344 (establishing an exception for commercial operations). The Missouri authorities up to 1946 are ably reviewed in Dille, supra. The net result of this line of cases has been that Missouri grants immunity from liability in negligence actions to a true charity in the activities and operations of the charity itself, as distinguished from some commercial enterprise in which it may invest its funds and which it operates. Blatt, supra. Missouri has proceeded both upon the trust fund theory and that of a broad public policy; even the waiver theory and the inapplicability of the rule of respondeat superior have been mentioned. But in Dille, supra, this court said (196 S.W.2d loc. cit. 620): "While the cases seem to treat the two theories, trust fund and public policy, under separate heads, the distinction between them is more apparent than real. At bottom they are the same, the trust fund doctrine being, as some of the cases say, the 'child' or 'offspring' of the doctrine [of] public policy. This is also true as to the nonapplicability of the rule of respondeat superior. The Virginia Supreme Court of Appeals in the St. Vincent Hospital case, supra, [Weston v. Hospital of St.

Vincent of Paul, 131 Va. 587, 107 S.E. 785, 23 A.L.R. 907] aptly stated the matter thus: 'The determination of a number of courts * * * that there should be absolute immunity in all cases, and which came to be known as the "trust fund theory," was nothing more than saying that the immunity was granted from reasons of public policy; that on the whole the public would be best served by the application of this theory.'" And the court there also (196 S.W.2d loc. cit. 616) outlined the differing theories of or reasons for immunity. It may thus be, as plaintiff now so ardently contends, that the real and sole basis of our doctrine of immunity is public policy; the opinion in Blatt, supra, so states. Essentially, this means that the State considers that it is better for the public generally that charities be permitted to continue their activities for the benefit of all the people without depletion of their funds by the payment of the damage claims of certain individuals.

■ Counsel for plaintiff roundly criticize the doctrine of immunity, and specifically the Adams case. As to the latter, they say that it relied on English dicta later repudiated, that there was no legislation on the subject, and that the opinion had no basis in any "announced public policy," but merely expounded the "personal opinion of a judge." We may accept, for present purposes, counsel's statement that public policy means that "no one can lawfully do that which tends to be injurious to the public or against the public good; * * *." Brawner v. Brawner, Banc, Mo., 327 S.W. 2d 808, 812; also, that the expression of public policy should be looked for and found in the "Constitution, statutes, or judicial decisions of the state or nation, and not in the varying personal opinions and whims of judges or courts, * * *." In re Rahn's Estate, 316 Mo. 492, 291 S.W. 120, 123, 51 A.L.R. 877, certiorari denied 274 U.S. 745, 47 S.Ct. 591, 71 L.Ed. 1325. But, in the absence of legislation, the courts have the power and the duty to declare the public policy of a state, and for that purpose may, if necessary, look to authorities outside the

state. In their criticisms of the Adams case counsel have attributed to Judge Ellison an expressed antipathy to damage claims which is wholly unjustified; what he said was confined solely to the matter of subjecting charitable funds and assets to the payment of such claims. They seem to argue further that because there was no established law on the subject in Missouri in 1907, a declaration of the doctrine by the court was wholly baseless and, presumably, ineffective. If that were true, a court could never declare a matter of public policy in the first instance, without legislation. Questions involving matters of public policy do occasionally confront our courts in a total absence of constitutional or legislative mandates. Landgraver v. Emanuel Lutheran Charity Board, 203 Or. 489, 280 P.2d 301, 302. In those instances they have the right and the duty to declare what they deem to be the public policy, looking to all such sources as are available; and once declared, this is just as binding as a legislative enactment. See, Landgraver, supra, citing numerous authorities. The court in Adams did so, and the opinion is no expression of a mere *whim* or *"personal opinion."* The court there cited decisions of the courts of several other states in support of its ruling, and we are not particularly concerned with the legitimacy or illegitimacy of the brain child of the House of Lords as expressed in Heriot's Hospital v. Ross, 12 Clark & F. 507; considerable controversy has raged around the English cases and the supposed origin of the doctrine. See, Gregory v. Salem General Hospital, 175 Or. 464, 153 P.2d 837, 844; President and Directors of Georgetown College v. Hughes, 76 U.S.App.D.C. 123, 130 F.2d 810, 815 et seq.; 5 St. Louis University Law Journal, 357 et seq.; 25 A.L.R.2d 29, 38–39 note. We are not so much interested in the historical origin of the doctrine as we are in the fact that more than half a century ago our courts (and sundry others in the United States before or after that) declared this rule of immunity, primarily as a rule of public policy, in the absence of legislation and of any indicated contrary legislative

intent, and that this doctrine has been consistently followed in Missouri ever since. See, Muller v. Nebraska Methodist Hospital, 160 Neb. 279, 70 N.W.2d 86, loc. cit. 91. In its origin the doctrine was a valid declaration of public policy and it has been corroborated and strengthened with each succeeding opinion through all these years.

At this point we note that in the 1957 and 1959 Missouri Legislatures bills were introduced to nullify or restrict the immunity. The 1957 Senate Bill (No. 153) proposed to preserve the immunity as to the charity, but to permit the substitution of any existing liability insurer as a defendant. It was never reported out of the Judiciary Committee. The 1959 House Bill (No. 415) very frankly provided that the charitable nature of a defendant should "not be a defense." This bill, with amendments, was tabled on the House floor and died on the calendar, never being perfected. We must presume that the legislature was cognizant of our decisions. Counsel say, with extreme frankness, that: "The facts of life, as this court well knows, made it highly improbable that such legislation would ever pass. Imagine the furor that would be raised if a bill were introduced in our General Assembly suggesting that our hospitals, schools, churches and other immune institutions be made liable for their torts! It would take a veritable daredevil of a legislator to vote for the bill, not to mention introduce it." This statement is, to us, an admission that the public policy of Missouri would, and does, oppose the destruction of the presently existing immunity. Legislators are elected to represent and vote the will of the people,—all the people, not individual claimants. If the legislators who so acted in 1957 and 1959 did not truly represent the will of the people, we may assume that the people will elect others. Mere inaction of the legislature has been construed as an approval of the doctrine of immunity as declared by a line of court decisions. Gregory v. Salem General Hospital, 175 Or. 464, 153 P.2d 837, 845; Landgraver, supra; Memorial Hospital, Inc. v.

Oakes, 200 Va. 878, 108 S.E.2d 388, 396. Here we have more,—an express refusal of the legislature to act; the words of the court in Martino v. Grace-New Haven Community Hospital, 146 Conn. 735, 148 A.2d 259, 260-261, are appropriate: "The plaintiff contends that the doctrine of charitable immunity, so far as it applies to charitable hospital corporations, should be abandoned. In 1955 an effort was made in the legislature to change the law. The bill in question was reported unfavorably and rejected. * * * 'The rejection by the legislature of a bill designed to overrule a judicial precedent by legislative enactment furnishes strong reason for the court's refusal to reverse the precedent.' McDermott v. St. Mary's Hospital Corporation, 144 Conn. 417, 422, 133 A.2d 608, 611."

In the face of these express refusals of our legislature to repeal or limit the doctrine of immunity, counsel say that the legislature has inferentially done so, and that it has declared a contra public policy in other legislation. This would seem to imply that it has hidden its real intention "under the table." To such purpose he cites the Motor Vehicle Safety Responsibility Act (Ch. 303, RSMo 1959, V.A.M.S., Laws 1945), the Workmen's Compensation Law (Ch. 287, RSMo 1959, V.A.M.S., Laws 1925), the Employment Security Law (Ch. 288, RSMo 1949, V.A.M.S., Laws 1951), and the Not for Profit Corporation Law (Ch. 355, RSMo 1959, V.A.M.S., Laws 1953). It is a little difficult for us to follow some of this reasoning. Counsel say, however, that in failing to exempt charitable corporations and associations from the requirements of the Motor Vehicle and Workmen's Compensation Laws, these being statements of broad public policy, the legislature has evidenced an intention to repeal the immunity. We hold that if it has thus done so to any extent, and we do not now pass on that question, it has only thereby affected the particular activities expressly covered in those enactments, i. e., the operation of automobiles and the compensation of injured employees. (We note here that Workmen's Compensation liability exists wholly independently of negligence or common law tort liability.) Our view is fully corroborated by the fact that long subsequent to both of those enactments, and after our doctrine of immunity had been stated to rest upon public policy (Dille, Blatt, supra) the legislature expressly refused to abolish the general rule of immunity as declared by our courts. In the Employment Security Law, charitable corporations were expressly exempted from the tax. Section 288.034(6) (f). Counsel merely argue from this that in each act "ample thought" is given to the matter of charities. This argument is certainly not persuasive. The "General Not for Profit Corporation Law" includes many corporations not strictly charitable. See "Purposes" covered in § 355.025. Plaintiff seems to rely on the provision therein permitting such corporations "to sue and be sued, complain and defend * * *," Section 355.090 (2), the power, which counsel infer, to buy liability insurance, and the absence therein of any stated immunity for charitable corporations. The present defendant was not incorporated under that law but under the "Benevolent, Religious" etc. Associations Act (now Ch. 352) in 1948 by pro forma decree; there is no contention whatever that it was not properly organized under that act, or that it is not, in fact, strictly a charity. We wholly fail to see that the Nonprofit Act declares any public policy inimical to our declaration of public policy regarding true charities, and we hold that it does not. That act and our rule of immunity may supplement each other, but they do not conflict.

■ No provision of our Constitution, 1945 or 1875, constitutes a declaration of public policy contrary to our rule of immunity. The permissive exemption of charities from taxation (Art. 10, § 6, 1875; Art. 10, § 6, 1945, V.A.M.S., the latter much broader) indicates a studied intent to favor and exempt charities rather than to impose any additional liability. See, generally, Muller v. Nebraska Methodist Hospital, 160 Neb. 279, 70 N.W.2d 86; Landgraver v.

Emanuel Lutheran Charity Board, 203 Or. 489, 280 P.2d 301. Nor do we construe the rule of immunity to be in any way a violation of §§ 13 or 14 of Art. 1, Mo. Constitution 1945, the former of which proscribes the "making any irrevocable grant of special privileges or immunities," and the latter of which provides that the courts of justice shall be open to every person and "certain remedy afforded for every injury * * *." As to § 13 see, generally, State ex rel. Jones v. Nolte, 350 Mo. 271, 165 S.W.2d 632, 638; the "privileges" prohibited are those granted to individuals, not to charities as a class, charities being expressly recognized in Art. 10, § 6, as indicated. Section 14, Art. 10, was never intended to create rights, but merely to protect citizens in enforcing rights recognized by the law, without discrimination. DeMay v. Liberty Foundry Co., 327 Mo. 495, 37 S.W.2d 640, 645–646; State ex rel. National Refining Co. v. Seehorn, 344 Mo. 547, 127 S.W.2d 418, 424; Muller v. Nebraska Methodist Hospital, 160 Neb. 279, 70 N.W.2d 86, 91; Kreuger v. Schmiechen, 364 Mo. 568, 264 S.W.2d 311, 314. We are not impressed with the logic of the incidental statement in Nicholson v. Good Samaritan Hospital, 145 Fla. 360, 199 So. 344, 133 A.L.R. 809, supposedly to the contrary. It is not applicable here. In their reply brief, counsel for plaintiff argue that the immunity doctrine violates the due process clauses of both the Missouri and federal constitutions. No such contention was included in the rather elaborate points of their original brief and the issues on this appeal may not be so expanded; the respondent should be afforded a fair opportunity to answer all points and all arguments. Magenheim v. Board of Education, Mo., 340 S.W.2d 619; Berghorn v. Reorganized School Dist. No. 8, 364 Mo. 121, 260 S.W.2d 573; Rule 83.05(a) (e), V.A. M.R. This does not mean that we see any substance in the contention. We have been liberal in considering the constitutional points briefly discussed above, for they were inadequately included in the appellant's points in his original brief.

On his basic contention that the doctrine of immunity is wrong and should be repudiated, plaintiff cites several recent decisions, including: Kojis v. Doctors Hospital, 12 Wis.2d 367, 107 N.W.2d 131 (1961); Bing v. Thunig, 2 N.Y.2d 656, 143 N.E.2d 3 (1957); Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29, 141 A.2d 276 (1958); Pierce v. Yakima Valley Memorial Hospital Ass'n, 43 Wash.2d 162, 260 P.2d 765 (1953); Mullikin v. Jewish Hospital Ass'n, Ky., 348 S.W.2d 930, and President and Directors of Georgetown College v. Hughes, 76 U.S.App.D.C. 123, 130 F.2d 810. There is no doubt that in these cases the courts did repudiate the doctrine of charitable immunity, on varying reasoning; but we note that in all five states the doctrine had been restricted previously, in some very severely. In New York the courts had recognized liability for "administrative" negligence but not for "medical" negligence, an almost impossible and unworkable distinction from a practical standpoint; and the immunity was apparently limited also to hospitals only (143 N.E.2d loc. cit. 8). It seems clear that this former New York rule was more or less of an evasion or, in the words of the court, "difficult and elusive" and a "compromise." In New Jersey the immunity had previously been applied only where suit was filed by a beneficiary (patient, etc.) and not by a stranger, a rather illogical distinction, it would seem, though often followed. Also, in the same year, the New Jersey Legislature restored the immunity to all charities (again confining it to "beneficiaries") except that hospitals might be liable to the extent of $10,000, but no more. In Wisconsin the previous rule had apparently been rather severely restricted; the decision permitting recovery was confined to "* * * a paying patient seeking recovery from a charitable hospital * * *." [12 Wis.2d 367, 107 N.W.2d 134] In Pierce, supra, the doctrine of immunity had previously been very much limited,—to beneficiaries, and then not available in cases of "administrative" negligence or where a

servant was negligently selected or retained; thus, as the court said, the rule had already been "'devoured' with exceptions" (loc. cit. 772); apparently the decision was confined to the case of a paying patient in a nonprofit hospital. In two of these cases there were vigorous dissents, in another, a dissent without opinion, and in another a concurrence in result which constituted a dissent from the total rejection of immunity. In Roberts, the opinion did not receive a majority vote of the six judges; three concurred in the result only, on the ground that the plaintiff was a stranger to the charity and thus entitled to recover under a limited theory of immunity without the necessity of considering the doctrine further.

Other recent cases might be added to those just discussed, as showing rejections of the doctrine of immunity; usually, however, it had been restricted rather severely in earlier cases. See, Moeller v. Hauser, 237 Minn. 368, 54 N.W.2d 639, 57 A.L.R.2d 364 (1952); Mississippi Baptist Hospital v. Holmes, 214 Miss. 906, 55 So.2d 142, 56 So.2d 709, 25 A.L.R.2d 12 (1951); Foster v. Roman Catholic Diocese of Vermont, 116 Vt. 124, 70 A.2d 230, 25 A.L.R.2d 1 (1950); Roman Catholic Church, Diocese of Tucson v. Keenan, 74 Ariz. 20, 243 P.2d 455 (1952). It is said that nineteen jurisdictions (whether all are states of the union we do not know) have abandoned the doctrine since 1942, in so far as it concerns charitable *hospitals*. American Bar Ass'n Journal, May 1961, Vol. 47, p. 515. We have neither the time nor the space to discuss all those authorities. It might well be said that some courts have found themselves so enmeshed in illogical and unworkable exceptions to the doctrine that they considered its abolition as the only means of escape. On the other hand, the following states have recently, upon reconsideration, refused to reject the doctrine of charitable immunity. Cabbiness v. City of North Little Rock, 228 Ark. 356, 307 S.W.2d 529 (1957), reaffirmed in Helton v. Sisters of Mercy, etc., Ark., 351 S.W.2d 129, Oct. 30, 1961; Landgraver

v. Emanuel Lutheran Charity Board, 203 Or. 489, 280 P.2d 301 (1955); Martino v. Grace-New Haven Community Hospital, 146 Conn. 735, 148 A.2d 259 (1959); Muller v. Nebraska Methodist Hospital, 160 Neb. 279, 70 N.W.2d 86 (1955); Springer v. Federated Church of Reno, 71 Nev. 177, 283 P.2d 1071 (1955); Knecht v. St. Mary's Hospital, 392 Pa. 75, 140 A.2d 30 (1958); Penaloza v. Baptist Memorial Hospital, Tex.Civ.App., 304 S.W.2d 203 (1957); Meade v. St. Francis Hospital of Charleston, 137 W.Va. 834, 74 S.E.2d 405 (1953); Williams v. Randolph Hospital, Inc., 237 N.C. 387, 75 S.E.2d 303 (1953); Mastrangelo v. Maverick Dispensary, 330 Mass. 708, 115 N.E.2d 455 (1953); Memorial Hospital, Inc. v. Oakes, Adm'x, 200 Va. 878, 108 S.E. 2d 388 (1959); Cornelius v. Sinai Hospital of Baltimore, Inc., 219 Md. 116, 148 A.2d 567 (1959).

A rather comprehensive table of the rulings of the different states on this subject appears in the appendix to an article in 5 St. Louis University Law Journal at p. 369 (1959). Those interested may find there at least an approximation of the present score. However, we are not going to decide this case by "counting the noses" of the states, pro and con, but on what we deem to be the accepted public policy of Missouri and the best interests of its people, generally. Running predominantly through the opinions refusing all charitable immunity, are such statements as the following: that liability insurance is available and is usually carried; that the courts are "not informed" that hardships or calamities have ensued where liability is recognized (N. Y., Wash., D. C.); that today's hospitals are quite different from those of prior years, with wide community support, many employees, and business-like operations; and also that the trend is to shift the burden from innocent victims to the community at large. (Many of the opinions rejecting immunity are apparently considering only the effect of the rule as applied to hospitals.) On the contrary, the courts upholding immunity in whole or in part, and sundry dis-

senting opinions in others, suggest, generally: that the question concerns the abolition of a declared principle of long standing public policy, which, once declared by the courts, is just as effective as a legislative act; that the failure of the legislature to act, it knowing full well of the decisions, compels an inference of approval; that if the doctrine is to be abolished after being so firmly adopted and adhered to, the action should come from the legislature; that many charities have not availed themselves of insurance and that, in any event, the existence of insurance (in the absence of statute) should make no difference in *liability*; and that the courts which refer to the lack of hardship in states refusing immunity have no evidence or statistics to support the statement, are not in position to know, and are merely speculating.

As the court well stated in Muller v. Nebraska Methodist Hospital, 160 Neb. 279, 70 N.W.2d 86, 93, certainly not all of our charities are big businesses, generously endowed (as some of the opinions indicate), and thus able to absorb substantial losses. Throughout Missouri we have many small charities which certainly have not, and never will, reach the suggested status of affluence,—religious, cultural, educational, medical and those strictly benevolent in the sense of aiding the poor and needy. Unlike those courts which have so confidently spoken, we are not so omniscient as to forecast accurately the result, upon such institutions, of the abolition of our rule. Nor do we agree with the apparent theory of some that private charity is a " 'thing of the past and that all burdens of suffering humanity should be placed in the lap of government, state and federal.' " Muller v. Nebraska Methodist Hospital, supra. There is absolutely nothing in the facts of the present case calling for a limitation of, or further exception to, our doctrine.

We have considered counsel's so-called "Practical Reasons" for the abolition of immunity, but they require nothing more than what has already been said. Counsel argue at length that we are not bound by the doctrine of stare decisis. We may assume that, for present purposes, although the prevailing doctrine should be adhered to " '* * * unless the reasons therefor have ceased to exist, are clearly erroneous, or are manifestly wrong and mischievous or unless more harm than good will result from doing so.' " Muller v. The Nebraska Methodist Hospital, supra. And, as our own court said in Brawner v. Brawner, Banc, Mo., 327 S.W.2d 808, 814, referring to the spousal immunity from suit: "It affects more than private rights, 26 Am. Jur. 633, Husband and Wife § 4, and should not be lightly disturbed." We need not seek refuge in the doctrine of stare decisis here. We have declared and have long adhered to the doctrine of immunity as applied to true charities in their charitable operations, and we see no such change of circumstances, conditions or public policy, as to cause us to reject it now. The origin of the Missouri doctrine has been questioned here; we are convinced that it was sound, but in any event, each succeeding case has corroborated and re-declared it. In these circumstances, and particularly in view of the legislature's failure to act for fifty years and its outright refusal to repeal or limit the immunity thereafter, we are firmly convinced that any future change should come by legislative action. The difficulty in procuring such action is a matter wholly outside the scope of our endeavors.

Counsel have, rather casually, argued the existence of liability insurance; we suspect that this is, beneath the surface, strongly relied on. We have held specifically in Dille v. St. Luke's Hospital, 355 Mo. 436, 196 S.W.2d 615; Stedem v. Jewish Memorial Hospital Ass'n of Kansas City, 239 Mo. App. 38, 187 S.W.2d 469, and Kreuger v. Schmiechen, 364 Mo. 568, 264 S.W.2d 311, that this is immaterial on the issue of liability. See also: Clarke v. Organ, Banc, Mo., 329 S.W.2d 670, 674; Baker v. Baker, 364 Mo. 453, 263 S.W.2d 29. No reason is presented now which causes us to feel that

those authorities should be re-examined. Nor does the possibility of procuring insurance persuade us that a decision on the public policy question should be otherwise. As a practical matter, some charities may not be able (financially or because of refusals to carry the risk) to procure insurance, and some may, as often happens, encounter a refusal to renew after one or more losses. It is idle to assume that insurance is a cure-all for the ills and liabilities of charitable institutions, particularly when we speculate upon what the cost may be if full liability should be recognized.

The judgment will be affirmed. It is so ordered.

All concur.