**Edward ABERNATHY, Plaintiff-Appellant,**

**v.**

**SISTERS OF ST. MARY'S d/b/a St. Mary's Hospital, Defendant-Respondent.**

**No. 53883.**

Supreme Court of Missouri,
En Banc.

Nov. 10, 1969.

Burton H. Shostak, Hoffman & Shostak, St. Louis, for appellant; Klamen & Weisman, Clayton, of counsel.

R. E. Keaney, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for respondent.

Forrest P. Carson, George A. Rozier, Jefferson City, Elliott P. Koenig, St. Louis, for amici curiae.

Carson, Inglish, Monaco & Coil, Jefferson City, for amicus curiae, Missouri Hospital Assn.

Rassieur, Long, Yawitz, Koenig & Schneider, St. Louis, for amicus curiae, Hospital Assn. of Metropolitan St. Louis.

HENLEY, Chief Justice.

This is an action by a patient against a hospital for $35,000 damages for personal

injuries allegedly suffered as a result of negligence of defendant. Defendant moved for summary judgment, alleging that it is, and operates the hospital as, a benevolent, religious, nonprofit corporation and charitable institution and, therefore, is immune from liability for its torts. The motion was sustained, judgment was entered for defendant, and plaintiff appealed.

The question presented is whether Missouri should continue to adhere to the doctrine that a charitable institution is immune from liability for the tortious acts of its agents and employees. We abolish the doctrine.

This case and another, Garnier et al. v. St. Andrew Presbyterian Church of St. Louis, Mo., 446 S.W.2d 607, presenting the same question and decided concurrently herewith, were first briefed, argued and submitted in Division. Those submissions were set aside and both cases transferred to the court, en banc, on the court's own motion, where they were again argued and submitted. We acknowledge the assistance furnished the court by the brief and argument of amici curiae, Missouri Hospital Association and Hospital Association of Metropolitan St. Louis, as well as the argument, briefs and supplemental briefs of the parties.

Plaintiff's petition alleges, in substance, that while a paying patient in defendant's hospital he was assisted by Marie Taylor, an employee of the hospital and an original defendant in this action,[1] to move from his bed to his bathroom where he was left by the employee unattended; that due to his weakened condition he fell to the bathroom floor and suffered multiple injuries, including a fracture of his right leg; that his injuries were the result of negligence of the hospital in failing (1) to provide handrails for his support in lowering and raising his body to and from the toilet seat; and (2) to furnish a nurse or attendant to remain with and assist him in these necessary body functions. We assume the truth of these allegations of fact and those of the motion for summary judgment.

The doctrine of immunity of charitable institutions from liability for tort was adopted in this state in 1907 by a decision of the Kansas City Court of Appeals in Adams v. University Hospital, 122 Mo.App. 675, 99 S.W. 453. Plaintiff, Adams, a paying patient,[2] while still under the influence of an anesthetic, suffered post-operation burns from hot water bottles administered by incompetent nurses employed by defendant. Judgment was for plaintiff and the Court of Appeals reversed, holding, in substance, that it is the public policy of this state that a charitable institution is immune from liability for damages for its own negligence in selecting incompetent employees and for the negligence of its employees. In adopting this policy the court reasoned that it is in the best interest of every member of the public, and the state itself, that charitable institutions designed either for the alleviation of human suffering or for the " * * * moral being of mankind * * *" be built up and maintained by the funds of the benevolent and that those institutions be protected from any action which might tend either to close the purses of donors or deplete its funds and thereby prevent the institution from performing its functions. In other words, the court said, in effect, that it is better that the individual suffer injury without compensation from the negligent charitable institution than to risk the judicially assumed probability that the public and state would be deprived of the benefits of the charity; that the interest of the latter is so supreme that the former must be sacrificed to it.

[1] The action against the employee, Taylor, was dismissed by plaintiff without prejudice before final judgment.

[2] Missouri has made no distinction in this type case between paying and nonpaying patients, strangers or invitees. The court said parenthetically (99 S.W. at 454) that it makes no difference whether the person is a paying or nonpaying patient.

While resting the immunity doctrine on public policy, the court refers to two legal theories as justification and support. The first theory is that of "implied waiver," that he who accepts the benefit of charity does so upon the implied assurance that he will not assert against the institution a claim for damages for injuries resulting from its negligence or the negligence of its employees. The second is the "trust fund" theory, that the funds of the institution are given and held in trust for a charitable purpose and shall not be used to compensate persons suffering injury resulting from the tortious acts of the institution or its employees, because that use would be contrary to the intent of the donor and beyond the powers of the trustee.

The court observed that both reason and the great weight of authority support its views and the adoption of this policy, citing, among other cases, McDonald v. Massachusetts General Hospital, 120 Mass. 432, 21 Am.Rep. 529.[3] The doctrine laid down in the Adams case has been followed in this state sixty-odd years[4] and was last thoroughly considered, and reexamined and reaffirmed eight years ago in Schulte v. Missionaries of La Salette Corporation of Missouri, Mo., 352 S.W.2d 636.

In obedience to the long line of decisions in this state upholding the doctrine of immunity there was no course open to the trial judge but to enter judgment for defendant.

Plaintiff recognizes the state of our law on the subject, but he makes a direct, frontal attack on it, saying it denies basic, substantive rights of the individual; that it is not fair now, has never been fair and will never be fair; that whatever the reason for the doctrine in its inception, it does not exist today and the doctrine should be abolished. More or less obliquely, he says also that the fact defendant carries public liability insurance and that its insuror would pay any damages for injury resulting from its negligence removes the reason for and the need, if any ever existed, of protecting the institution from damage claims. Defendants and amici curiae contend, contra, that the reasons for the doctrine still exist; that charitable institutions should continue to be immune from tort liability so long as they are operated for the alleviation of human suffering of the moral well-being of mankind, and so long as no part of the institution's funds is profit from operation inuring to the benefit of a private person; that the fact the institution is protected by public liability insurance has no relation to the basic issue of liability vel non. Defendant and amici curiae contend also that the doctrine of immunity is so firmly embedded as public policy that if it is to be modified or abolished it properly should be done by the legislature rather than the court. Amici curiae add an interesting contention: that "due to the substantial amount of support received by hospitals from the goverment, via modern social security legislation, to hold hospitals liable for their torts would in essence violate the doctrine of sovereign immunity."

When Missouri adopted the doctrine, the courts in most of her sister states that had considered the question accorded immunity to charity. However, there was at that time considerable confusion among the

3. It is generally recognized that McDonald v. Massachusetts General Hospital, decided in 1876, was the first case in this country adopting the doctrine of charitable immunity; that the foundation of immunity is dictum in Heriot's Hospital v. Ross, 12 Clark & Fin. 507 (1846) and Duncan v. Findlater, 6 Clark & Fin. 894 (1839), the latter being followed in Holliday v. St. Leonard's, 142 Eng.Rep. 769 (1861) relied on in McDonald. However, Duncan was overruled in 1866, by Mersey Docks v. Gibbs, 11 Eng.Rep. 1500, and Holliday in 1871, by Foreman v. Mayor, 6 Q.B. 214. Therefore, it is said, the English foundation for the doctrine had been repudiated and was dead when the courts of this country resurrected and adopted it to aid the growth and development of the new nation.

4. The decisions are collected in Missouri Digest, Charities, Key No. 45(2).

states as to the reasons for and the extent of the doctrine,[5] and this confusion expanded geometrically year by year as more states adopted the doctrine. In fact, there was no theory upon which the doctrine of immunity had been bottomed by the courts of one state that had not been assailed and criticized by the courts of others, notwithstanding the fact they arrived at the same result. In 1942, when the late Mr. Justice Rutledge[6] wrote his now famous landmark opinion in President and Directors of Georgetown College v. Hughes, 76 U.S. App.D.C. 123, 130 F.2d 810, advocating abandonment of the doctrine, only six states[7] remained where full liability was the rule. Since that year the doctrine has been under continuous attack so devastating that today it lies almost in ruins.[8] By the time the instant case was submitted the situation had reversed; only four states remained where full immunity was the rule: Massachusetts, Missouri, Rhode Island and South Carolina.[9] We do not have the time nor space to list or discuss the cases where the rule is full liability or full immunity, or where the rule lies somewhere between these two extremes. Those interested will find them collected in Rabon v. Rowan Memorial Hospital, Inc., (1967), 269 N.C. 1, 152 S.E.2d 485, 1. c. 496–498; to these

there should be added the cases cited in Professor Davis' article referred to in our footnote 9.

We have reexamined and reconsidered the doctrine as a rule of public policy in the light of what is common knowledge of the facts of life today and conclude that it must be abolished. In expressing our reasons for this conclusion we acknowledge that much of what we say has already been said by the courts of our sister states. As a matter of fact there is little, if indeed there is anything, that has not been said by those courts about and against the doctrine as public policy as well as the several legal theories enunciated and advanced in its support.

Plaintiff argues that the general rule is, and always has been, that there must be a remedy for every wrong; that the doctrine of immunity runs directly counter to this basic concept of justice. The Court of Appeals in the *Adams* case,[10] and this court in subsequent decisions, recognized the rule, but deliberately chose to create an exception to it. There can be no doubt that at the time of its adoption the exception was a rule of expediency[11] justifiable then, and for some time thereafter, to encourage and protect charity as vital to the growth and

5. Annotation: Immunity of nongovernmental charity from liability for damages in tort, 25 A.L.R.2d 29.

6. Then a Judge of the United States Court of Appeals for the District of Columbia; later an Associate Justice of the United States Supreme Court.

7. See note, Charitable Immunity in Michigan, 36 University of Detroit Law Journal 636 (1959).

8. During the eight years since our decision in Schulte v. Missionaries of La Salette, supra, seven of the states referred to in *Schulte* 352 S.W.2d, at page 642 as having recently refused, after reconsideration, to reject the doctrine of charitable immunity have again reconsidered and abrogated the doctrine: Connecticut: By statute. See Public Acts of the State of Connecticut, 1967 session, p. 66. Maryland: By statute. See Maryland Code Annotated, section 566A,

(1966). Nebraska: Myers v. Drozda, 180 Neb. 183, 141 N.W.2d 852, (1966). North Carolina: Rabon v. Rowan Memorial Hospital, Inc., 269 N.C. 1, 152 S.E.2d 485 (1967). Oregon: Hungerford v. Portland Sanitarium and Benevolent Ass'n, 235 Or. 412, 384 P.2d 1009 (1963). Pennsylvania: Flagiello v. Pennsylvania Hospital, 417 Pa. 486, 208 A.2d 193 (1965). West Virginia: Adkins v. St. Francis Hospital of Charleston, 149 W.Va. 705, 143 S.E.2d 154 (1965).

9. See Davis, The Charitable Immunity Doctrine, Journal of the Missouri Bar, July, 1969, p. 353.

10. 99 S.W. at 456.

11. Parker v. Port Huron Hospital, 361 Mich. 1, 105 N.W.2d 1, 12. See also Rabon v. Rowan Memorial Hospital, Inc., 152 S.E.2d 485, 492.

development of the state, but the reasons for the exception to the rule do not exist today. Today we have a new set of facts, conditions and circumstances. In the period of our history when the doctrine of immunity arose charity operated on a small scale; most persons engaged in the operation of its institutions gave their time, free, as their contribution to society; most gifts to charity were not corporate but private; and the needs of charitable institutions were, for the most part, poorly satisfied. "Today charity is big business. It often is corporate both in the identity of the donor and in the identity of the donee who administers the charity. Tax deductions sometimes make it actually profitable for doners to give to charity. Organized corporate charity takes over large areas of social activity which otherwise would have to be handled by government, or even by private business. Charity today is a large-scale operation with salaries, costs and other expenses similar to business generally. It makes sense to say that this kind of charity should pay its own way, not only as to its office expenses but as to the expense of insurance to pay for torts as well." Parker v. Port Huron Hospital, supra, 105 N.W.2d at 12–13. Today public liability insurance is available to charitable institutions to indemnify them against losses by way of damages for their negligence, and it is common knowledge that most charitable institutions carry such insurance and pay the premiums thereon as a part of their normal cost of operation.[12] In the states where immunity has not been accorded charity, experience has shown that the apprehension expressed here and elsewhere that the purses of donors would be closed and the funds of charity depleted if these institutions were not granted immunity was not well founded. In the quarter century since the doctrine began its decline, there has been no indication in the states which have abolished immunity that its withdrawal has discouraged donations or that the funds of these institutions have been depleted resulting in their demise.[13]

The public is doubtless still interested in the maintenance of charitable institutions and we acknowledge society's debt to them and recognize their right to every benefit and assistance which the law can justly allow. But the day has arrived when these institutions must acknowledge the injustice of denying compensation to a person injured as a result of their negligence or the negligence of their agents or employees; when they must acknowledge that all persons, organizations and corporations stand equal before the law and must be bound or excused alike. They must recognize that " * * * immunity fosters neglect and breeds irresponsibility, while liability promotes care and caution * * * ;"[14] that the public has an interest also in the protection of life and limb of the individual as a member of society and must require that those who minister to these needs do so carefully; that to lift the mantle of im-

---

12. We do not make the existence of liability insurance the criterion of liability, as some states have done; we merely emphasize its availability and widespread use as a fact and circumstance that did not exist when the doctrine was adopted. We have held that the existence of liability insurance is immaterial on the issue of liability and adhere to that decision. Dille v. St. Luke's Hospital, 355 Mo. 436, 196 S.W.2d 615; Kreuger v. Schmiechen, 364 Mo. 568, 264 S.W.2d 311.

As to the defendant hospital, we note it is also common knowledge that there is available and most persons carry hospitalization insurance to reduce their loss of capital and, in some instances, income, as a result of prolonged and expensive necessary hospital confinement. The proceeds of this insurance, and the availability of medicare and medicaid and their benefit payments to those who have reached that point in life where their income production has decreased, or stopped, inures to the benefit of these charitable institutions and reduces to that extent the demands upon pure charity.

13. 2 Harper and James, Torts, § 29.16; Rabon v. Rowan Memorial Hospital, Inc., supra, 152 S.E.2d at page 490.

14. 152 S.E.2d at 493.

munity will tend to promote care and caution.

The theory of "implied waiver," namely, that he who accepts the benefit of charity impliedly agrees he will not assert against the institution any right of recourse for wrong done him is a mere fiction. The fiction is based upon impossibility in many instances. It is impossible to say that a conscious or unconscious grievously injured accident victim carried to the emergency room of a charitable hospital, or an ill person received at such hospital unconscious, or a conscious ill person who enters such hospital by arrangement of others waives his rights by accepting its benefits. To say that an insane person, a minor or babe in arms waives his rights when he receives or there is administered to him the benefits of *any* charitable institution does violence to the facts; such persons have no legal capacity to will away their rights. The waiver theory obviously cannot be applied alike to all persons and this fact points up the fallacy in relying upon it to support immunity as a rule of public policy.

The "trust fund" theory as support for the doctrine of immunity rests on an illogical, and therefore weak, foundation. The essence of the theory is that the institutions' funds, given and held for charitable purposes, cannot be used to *pay* judgments resulting from tort claims. Thus, the rationale of the theory is identified solely with the right to *satisfaction* of a judgment, rather than to the fundamental question of whether an injured person has a right to maintain an action and secure a judgment. If it is reasonable to say, and it is, that the existence of liability insurance does not create liability where none exists, [15] then it is also reasonable to say that the inability to have satisfaction of a judgment does not create or support exemption from liability where exemption does not otherwise exist.

The "trust fund" theory embraces all that is involved in the doctrine of immunity as public policy. As the court said in the Dille case,[16] " * * * the distinction between them [the theory and the doctrine] is more apparent than real * * *, [because] [a]t bottom they are the same * * * ;" that the decision to grant immunity, " * * * which came to be known as the 'trust fund theory,' was nothing more than saying that the immunity was granted from reasons of public policy * * *." Hence, we need say little, if anything, more about this theory as an original support for immunity beyond what we have said about the lack of reason today for continuing to uphold the doctrine as a rule of public policy.

There are other persuasive reasons for abandoning the doctrine. Two of these are: (1) that neither those who organize or support charitable institutions nor the courts have the authority to put charities beyond the pale of the law applicable to all; (2) the protection of life and limb by organized society is of greater importance to mankind then any species of charity.[17]

Nor may reason or the law sanction a distinction between "big" or what may be considered by many to be "little" charitable institutions. There are, no doubt, many of the latter struggling for existence. But, what are the definitions of these two classes, and more important and to the point, where between the two may the law, with reason and in justice, draw the line? The injured person suffers no less damage by the carelessness of the "little" than he does by that of the "big" charitable institution. What was said in 1880 by the Supreme Court of Rhode Island is as apt today as it was then: "The suggestion that the funds would be exhausted by judgments, presupposes that the hospital is to be continued under negligent management. If that be so, then the sooner its funds are exhausted by compensating those injured, and persons

---

15. Stedem v. Jewish Memorial Hospital Ass'n of Kansas City, 239 Mo.App. 38, 187 S.W.2d 469, 471–473 [4, 5, 6].

16. Dille v. St. Luke's Hospital, 355 Mo. 436, 196 S.W.2d 615, 620.

17. 25 A.L.R.2d at 43.

are deterred from endowing it by being notified of its mismanagement, the better for all persons interested as well as the public. Particularly the public, as charitable persons will always exist, and by the enforcement of this liability the usefulness of institutions are increased, and persons are informed of institutions whose usefulness is impaired by mismanagement and negligence. In this way all charitable institutions that deserve the assistance and encouragement of the public and individuals are promoted and unmeritorious ones are prevented from imposing upon the public and benevolent persons."[18] To make this distinction and attempt to define the two classes would lead probably to as much confusion in this state as that which existed in several states where distinctions in the right to recover were made between strangers and invitees, and paying and nonpaying patients or other beneficiaries of a charitable institution's activities.[19]

■ We find no substance in the argument of amici curiae that since hospitals receive a large percentage of their income from the federal government through the various Social Security programs the government and hospitals have formed a partnership in which the governmental partner " * * * must have some voice in determining whether a hospital can be liable in a tort action * * *," and, therefore, " * * * to hold a hospital liable for its torts would be in essence violating the doctrine of sovereign immunity." The partnership premise is a fiction, but, assuming the partnership, the legislative voice of the governmental partner has not been heard to say in establishing these programs that its cloak of immunity has been placed around the shoulders of the hospital. Income received by a hospital through federal Social Security programs does not create between the government and the hospital a partnership in a legal sense and does not

bestow sovereign immunity upon such charitable institutions.

Defendant and amici curiae recognize that the court has the authority to abolish or modify the doctrine of charitable immunity, but insist the doctrine as public policy is so deeply and firmly embedded in our law that if it is to be modified or abolished the change should be made by the legislature rather than the court. They rely primarily on Schulte v. Missionaries of La Salette Corporation of Missouri, Mo., 352 S.W.2d 636, in which the court expressed the view now urged upon us. Although eight years ago the court was of the opinion this change in the law of torts, if made, should be made by the legislature, that does not mean the court is forever bound to remain of that opinion. A different view was expressed in 1966 by Finch, J., in his concurring opinion in Koprivica v. Bethesda General Hospital, Mo., 410 S.W. 2d 84, 87, and we are now of the opinion his position, so clearly stated in that case, represents the proper function of the court in evolving the law of torts.

■ It is neither realistic nor consistent with the common law tradition to wait upon the legislature to correct an outmoded rule of case law. Nor is legislative silence as instructive or persuasive as it was considered to be in the Schulte case.[20] Who can say with absolute certitude that the General Assembly's failure to abolish the doctrine was not the result of a legislative position that, since the doctrine is court-made law, it is the court's function and responsibility to change it when change is required? The Supreme Court of Oregon, in the Hungerford case, said that the legislative indifference to remedies for private wrongs may be common enough in times when the assembly is occupied with a multitude of matters of grave public concern, but failure to enact a bill is not one of the constitutional methods

18. Glavin v. Rhode Island Hospital, 12 R.I. 411, 416.

19. See 25 A.L.R.2d at 89, et seq.

20. Hungerford v. Portland Sanitarium & Benevolent Ass'n (Oregon) 384 P.2d 1009, 1010–1011.

by which the assembly makes law.[21] We consider that statement more expressive of our views toward inaction by the legislature than the statements in *Schulte*. The judicial branch of government need not call to, or wait upon, the legislative branch to change a rule of law which the judicial branch itself created.[22] The Supreme Court of West Virginia in the Adkins case clearly and succinctly stated its view of the point now urged upon us in these words: "This Court closed the door upon this right of action; if the door is to be opened, and we think it must, it is within the province of this Court to do so." [23] We agree with that statement and add that, because we have the opinion the doctrine is harmful and archaic, to fail to open the door would be to abdicate our function.

■ For the reasons stated, we hold that a nongovernmental charitable institution is liable for its own negligence and for the negligence of its agents and employees acting within the scope of their employment. Adams v. University Hospital, supra, and all other decisions of like effect are overruled.

■ Having abolished the doctrine of charitable immunity, it remains for us to determine the point of departure from precedent. We are cognizant of the fact that retrospective application of our decision could result in great hardship to those institutions which have relied on our prior decisions upholding the doctrine of charitable immunity. Therefore, feeling that justice will best be served by prospective

application of the decision announced today, we hold that the new rule shall apply to this case and to all future causes of action arising after November 10, 1969, the date of the filing of this opinion. Koebel v. Tieman Coal & Material Co., 337 Mo. 561, 85 S.W.2d 519, 524[3]; Molitor v. Kaneland Community Unit District No. 302, 18 Ill.2d 11, 163 N.E.2d 89, 96–98, 86 A.L.R.2d 469[2, 3]; Parker v. Port Huron Hospital, (Mich.) 105 N.W.2d 1, 13–15[4–5].

The judgment is reversed and the cause remanded for further proceedings.

FINCH, SEILER, MORGAN, and HOLMAN, JJ., concur.

DONNELLY, J., concurs in result in separate concurring opinion filed.

STORCKMAN, J., absent.

DONNELLY, Judge (concurring in result).

I concur in the result on the basis of the particular facts and circumstances of this particular case but I do not concur in the complete abolition of the charitable immunity doctrine in Missouri. In my opinion, the public policy of the State would be better served by considering each case on its own facts and by determining whether the defendant in each case is entitled to the benefit of the charitable immunity doctrine. Cf. Blatt v. Geo. H. Nettleton Home For Aged Women, 365 Mo. 30, 275 S.W.2d 344.

21. 384 P.2d at 1011.

22. Adkins v. St. Francis Hospital of Charleston, 143 S.E.2d 154, 163.

23. 143 S.E.2d at 163.